NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240485-U

NO. 4-24-0485

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| YUSUF A. MANNING, | ) | No. 21CF407 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:* The appellate court affirmed the judgment of the trial court because (1) the prosecutor did not make improper remarks during closing argument and (2) the evidence was not closely balanced.

¶ 2   In July 2021, defendant, Yusuf A. Manning, was charged with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2020)) and domestic battery (*id.* § 12-3.2(a)(2)). In November 2023, a jury found defendant guilty of both crimes, and in February 2024, the trial court sentenced defendant to 15 years in prison.

¶ 3   Defendant appeals, arguing that he was denied a fair trial because during closing argument the prosecutor improperly (1) offered his personal opinion on defendant's credibility and guilt, (2) argued that the police officer's decision to detain defendant in handcuffs was circumstantial evidence of defendant's guilt, and (3) shifted the burden of proof by commenting on defendant's failure to produce a witness. We disagree and affirm.

¶ 4                                  I. BACKGROUND

¶ 5                                  A. The Charges

¶ 6        In July 2021, the State charged defendant with one count of aggravated criminal sexual assault (*id.* § 11-1.30(a)(2)) and one count of domestic battery with a prior domestic battery conviction (*id.* § 12-3.2(a)(2)). The charges alleged generally that defendant committed an act of sexual penetration with M.C., a family or household member of defendant, by the use of force or threat of force, causing bodily harm to M.C.

¶ 7                                  B. The Jury Trial

¶ 8        In November 2023, defendant's jury trial began. Defendant waived his right to counsel and represented himself throughout the trial.

¶ 9                                  1. *The Evidence*

¶ 10       The following evidence was presented at trial.

¶ 11                                 a. Alyssa Pilgrim

¶ 12       Alyssa Pilgrim testified that she was the manager of respiratory care at UnityPoint Health Pekin Hospital, where M.C. had been employed as a respiratory therapist for about seven years.

¶ 13       On July 6, 2021, M.C. was scheduled to work the third shift, beginning at 10:30 p.m.; however, she did not show up for work. Pilgrim was concerned because M.C. was a "dependable" employee who communicated well with Pilgrim; M.C.'s absence was "very uncharacteristic."

¶ 14       Pilgrim called and texted M.C. but received no response. Shortly thereafter, Pilgrim received a text message from M.C.'s phone that read as follows: "Was in wreak [*sic*] don't think I can get there tonight." Pilgrim viewed the text as "questionable" because she did not believe M.C.

would have misspelled "wreck."

¶ 15    At 11:05 p.m., Pilgrim texted M.C.'s phone, asking M.C. to call her. Pilgrim received a response, reading, "Sorry. My jaw hurts and swollen up… Can someone cover me[?]" Pilgrim again asked M.C. to call her and received another response, reading, "I can't talk… And I'm using [one] hand. *** I'm about to get stitches." Pilgrim then called the Peoria police to request a wellness check on M.C. because she "just felt like there was something wrong."

¶ 16                    b. Emmaline Waid

¶ 17    Emmaline Waid, a police officer with the Peoria Police Department, testified that on July 6, 2021, just before midnight, she was dispatched to M.C.'s residence to conduct a wellness check. She knocked on the front door, but no one answered. She returned to her squad car and made a phone call to the "original caller" to gather more information.

¶ 18    The trial court then admitted into evidence a portion of a video recorded by Waid's body camera showing Waid at her squad car calling M.C.'s phone number, then getting out of her squad car and approaching the porch. The video depicted defendant standing on the porch and Waid entering the house and finding M.C. inside.

¶ 19    Waid testified that M.C.'s face was bruised and her eyes were nearly swollen shut. M.C. also had "dried blood or some kind of marks" by her lip. Waid then detained defendant by placing him in handcuffs, explaining her actions as follows:

> "At that time, I was just detaining him so I could figure out what was going
> on, and obviously she had said that—or her face was all bruised. I didn't want him
> alone with the other officer outside [(Officer Landen Graham)] for just officer
> safety reasons, so we secured him in the car so I could further my investigation."

¶ 20    Waid testified that, after obtaining more details from M.C. about what had

happened, she called an ambulance and took photographs of the door to M.C.'s bedroom. The trial court admitted into evidence three photographs showing (1) a large piece of the door splintered and broken off and (2) the door handle lying on the ground. Waid also collected M.C.'s bedding and the pajamas that she was wearing at the time of Waid's arrival. Waid then transported defendant to the police department for an interview with detectives.

¶ 21　　　　　On cross-examination, Waid testified that M.C. initially told her that defendant had punched her in the face multiple times and prevented her from leaving her bedroom. When Waid spoke with her a second time to obtain more details, M.C. told Waid that defendant had also sexually assaulted her. Although M.C. said defendant had physically and sexually assaulted her on the bed, Waid did not see any blood on the bed.

¶ 22　　　　　Defendant asked Waid, "[M.C.] never mentioned throughout her statement [(to Waid)] that someone came to the house on [July 6, 2021,] to pay her rent money?" Waid answered, "I don't believe she said that."

¶ 23　　　　　　　　　　　　c. Landen Graham

¶ 24　　　　　Landen Graham, a police officer with the Peoria Police Department, testified that he arrived at M.C.'s house with Waid to conduct the wellness check. Initially, no one answered the door, but after some time, Waid was able to get defendant on the phone, and he agreed to step outside so the officers could talk to him. Graham stayed with defendant on the sidewalk while Waid went inside to check on M.C. Graham testified, "When I was sitting with him, he began to say just to get it over with and to put the handcuffs on him." Shortly thereafter, Waid came out of the house and placed defendant in handcuffs.

¶ 25　　　　　　　　　　　　d. Corey Miller

¶ 26　　　　　Detective Corey Miller of the Peoria Police Department testified that he went to

- 4 -

Carle Health Methodist Hospital on July 7, 2021, to speak with M.C. He described M.C. as "distraught," "very nervous, scared," and "in pain." He further described her as "very battered," with "swelling in the head area, the forehead, the eyes, the lips, [and] the nose."

¶ 27                                     e. Ashley Ince

¶ 28        Ashley Ince testified that she was an emergency room nurse at Carle Health Methodist Hospital. Ince conducted a sexual assault examination of M.C. at the hospital in the early hours of July 7, 2021. As part of her examination, Ince documented M.C.'s physical injuries, describing them as follows:

> "[H]er left eye was bruised and swollen nearly shut. There was a red bruise formed under her right eye. A laceration in the inside of her top lip, bruising to the right temple, bruising to the left eyebrow, hematoma on the left side of the forehead, right side of the top lip was swollen, and bruising to the left temple."

M.C. also reported tenderness and soreness to the back of her neck, chest, and wrists.

¶ 29        Ince testified that she also collected samples from M.C. to be placed in a "sex assault kit" provided to the hospital by the Illinois State Police. Ince collected swabs from M.C.'s mouth, fingernails, inner and outer vagina, and anus.

¶ 30        Ince also testified that M.C. described what had occurred prior to her coming to the hospital. According to Ince, M.C. stated that she was "dozing off" when defendant kicked in her bedroom door, climbed on top of her, "put his dick in [her] face and said suck on this." M.C. reported that she said "no," so defendant "smacked [her] multiple times in the face," began masturbating, and asked her to "lick his nipple." M.C. again said, "no," and defendant then punched her in the face 10 to 15 times. M.C. further reported to Ince that, over the course of the next "couple hours," defendant "forced [M.C.] to do oral, have sex, and even worse anal." She

said he "lied in bed holding [her]." When she thought he was asleep, she would try to get up, but he would pull her back into bed. He told her he would not hurt her anymore if she stopped making him mad. M.C. also reported that defendant took her phone and would not give it back to her; he also hid her glasses from her. M.C. also told Ince that she grabbed defendant's arm, but she did not know if she scratched him or not. M.C. also stated that she tried to bite defendant once, but she did not specify where on his body.

¶ 31        Ince also noted that M.C. was "calm" throughout the sexual assault examination, which lasted five or six hours, but she "became tearful when describing details of the event."

¶ 32                                 f. Kelly Maciejewski

¶ 33        Kelly Maciejewski testified that she was a forensic scientist specializing in DNA analysis at the Illinois State Police Forensic Science Laboratory in Springfield, Illinois. She analyzed the vaginal, oral, and anal swabs Ince had collected from M.C. at the hospital. She also obtained defendant's DNA profile from a buccal swab collected from him by a detective from the Peoria Police Department. She concluded that a male DNA profile generated from M.C.'s vaginal swab was consistent with defendant's DNA profile. She testified that defendant's DNA profile "would be expected to be found in approximately one in 860 octillion unrelated individuals." She also concluded that a male DNA profile generated from M.C.'s oral swab was consistent with defendant's DNA profile and "would be expected to be found in approximately 77 percent of the population." Regarding the anal swab, Maciejewski testified that "there was no male DNA detected in the sperm fraction," and there was an "overpowering amount of female DNA present" in the nonsperm fraction, meaning that the amount of male DNA was so small, "[i]t would have just been overshadowed by the female DNA profile."

¶ 34        On cross-examination, Maciejewski testified that sperm can be present in the mouth

for up to 48 hours and present in the vaginal and anal cavities for up to 72 hours, absent other activities such as rinsing the mouth, showering, or urinating. She stated that she is not able to tell, as part of her analysis, when DNA was deposited. She explained, however, that a full profile, such as the one she found in the vaginal swab, was indicative of "more recent activity."

¶ 35                                         g. M.C.

¶ 36        M.C. testified that in July 2021, she worked as a respiratory therapist at "Pekin Hospital" and lived in Peoria. She had been in a dating relationship with defendant since 2018, and he had lived at her house for about two years, but by the end of June 2021, she broke up with him and asked him to move out.

¶ 37        On the night of July 6, 2021, M.C. was supposed to be at work at 10:30 p.m., but she did not make it. The prosecutor walked her through the days leading up to that time. M.C. testified that she worked the night shift on July 4, 2021, and returned home the morning of July 5, 2021. Later that evening, defendant called her and asked if he could come over and pick up some clothes. She said yes and picked him up around 10 p.m. He asked if he could stay the night, and she answered that he could, but it was the last time. She explained that she was tired and did not feel like driving him back to where he had been staying.

¶ 38        M.C. testified that defendant went to the spare bedroom, which was across the hall from her bedroom, and she stayed downstairs, watching television. She went to bed around midnight and shut her bedroom door, locking it behind her. M.C. stated that she locked the door because she did not want defendant to come into her room and "try to do anything." After she fell asleep, she heard a loud bang on her door, "and next thing [she] knew, [defendant] was on top of [her]." She estimated this occurred between 1 a.m. and 3 a.m.

¶ 39        M.C. stated that defendant was straddling her and hitting his penis against her face,

asking her to "suck" it. She said no, and he "smacked" her a few times with a flat hand. Defendant then began to masturbate and wanted her to "lick his nipple." M.C. refused, and he punched her about 10 to 15 times. Because defendant was on top of M.C., she could not get away. M.C. said she was defiant for a little bit, but her face began to hurt so she gave in and licked his nipple. Then he forced her to perform oral sex on him by grabbing her head. He was still on top of her, straddling her. She tried to scratch him, but her nails were short, so it didn't work. She believed she tried to bite him at some point but was unsuccessful.

¶ 40 M.C. said defendant ejaculated in her mouth and she spat it out. He then positioned himself behind her and held her tightly. She testified that he held her in her room for about the next 24 hours, forcing her to perform oral sex on him three to five times over the course of the day. She said none of the oral sex was consensual on her part, but he had punched her so many times she stopped resisting to avoid being punched again. She stated that he also penetrated her vaginally one time and anally one time. The anal penetration was "punishment" because he had asked her if she wanted to call the police and she said, "[Y]es, please." She was not certain if he ejaculated when he penetrated her anally but testified that he did ejaculate when he penetrated her vaginally.

¶ 41 While defendant was holding M.C. in her room, any time she tried to move, he would begin hitting her and warning her not to make him mad. He did let her go to the restroom a few times to urinate, but he went with her and watched her. He also did not let her have her glasses, which she needed to see farther than three or four inches in front of her.

¶ 42 M.C. also testified that defendant had her phone and was the one who sent the messages about being in a "wreak." However, when the police officer later called her phone, she answered and spoke briefly with the officer. Defendant spoke to the police on her phone, too. The officer told them to open the door. M.C. stated that defendant "at first was refusing to go down

and answer the door," stating instead that "he wasn't going to go down and they could break in the door." But he changed his mind and answered the door. After he left the room, M.C. found her spare glasses on the bedside table and sat at the top of the stairs. M.C. testified that the officer shone her flashlight on M.C., "took one look at my face and said I'll be right back, I want to secure him in the back of the squad car."

¶ 43 Shortly thereafter, the officer returned and collected M.C.'s nightgown and bedding as evidence. M.C. went to the hospital, where she was examined by Ince. Medical personnel also took X-rays of her wrists and a CT scan of her head.

¶ 44 During cross-examination, defendant asked M.C. about "Amir," also known as "Rhonda's son." M.C. answered that Amir was the person who rented a second house that she owned. Defendant asked if Amir came to M.C.'s home around 10 a.m. on July 6, 2021, to pay his rent. M.C. answered, "I do not know what time he came. You had my phone. He texted. You texted back. You went down and got the money."

¶ 45 After changing topics for several questions, defendant returned to the topic of Amir, asking M.C, "Did [Amir] come to the house to drop off the [rent] before or after you claimed you were sexually assaulted?" M.C. answered, "It would have been after or—because it happened multiple times, there was a couple after that." M.C. acknowledged she did not yell for help but explained that she did not even know he was there because she was not awake. Defendant asked if Amir had called her phone to let her know he was at the front door, and M.C. answered, "If he had, I wasn't aware of it because you had my phone."

¶ 46                                    h. Defendant

¶ 47 Defendant testified that on July 5, 2021, around 10 p.m., M.C. picked him up from where he was temporarily staying and they returned to her house. Defendant changed his clothes,

and they talked for a while on the couch. He became tired and went upstairs to sleep. Defendant testified that he slept all night and woke up around 7 a.m. the next morning. M.C. was still asleep. He went to her bedroom, which was unlocked, grabbed her phone, and looked through it because he "wanted to be nosy." He saw that there was a message from Amir that he had rent money for her.

¶ 48        Defendant stated that he sent a text back to Amir about his having the rent money, writing, "okay." Amir then called M.C.'s phone, and defendant gave the phone to M.C., who had since woken up and come downstairs. Amir said he was on the porch, so M.C. went out to get the rent money from him. When she returned, defendant asked for $100, but M.C. did not answer. Defendant testified, "So, I initiated sex again." He stated that they had vaginal sex and he ejaculated in her vagina, then she tried to perform oral sex on him, "but she was unsuccessful."

¶ 49        Defendant stated that afterward, they watched television, then he went upstairs to shower. Once upstairs, he took the $100 that he had previously asked for from M.C.'s nightstand. When he exited the shower, he went to the spare bedroom and noticed the $100 and his phone were missing. When he went to M.C.'s bedroom, the door was locked. He banged on the door, but she would not respond. Because he had already damaged the door during an earlier, unrelated incident and he "had to pay for the door anyway," he broke the door using his shoulder and body. He estimated this occurred around 2:30 p.m. on July 6, 2021.

¶ 50        Defendant testified that M.C. began yelling and cursing about his breaking the door. She grabbed his phone and broke it. In response, defendant grabbed her phone off the nightstand. When he did, M.C. hit his arm with her fist, trying to get it back. She pulled on his shirt, he fell on top of her on the bed, and they physically fought over the phone. She dug her fingernails into his arm and tried to bite him. When he felt her teeth, his reaction was to protect himself by hitting her.

She kept trying to bite him, and he "knocked her head back," then hit her again when she continued to try to bite him. Defendant described a struggle during which M.C. persisted in trying to bite him and him punching her in response. He testified as follows:

> "She tried to bite me again, and this time I was trying to show that I meant don't bite me. I punched her. My punches was getting harder. I punched her, and she had glasses on. I punched her right under the glasses on this bone right here, and when I punched her right there, her glasses flew off."

¶ 51   Defendant stated that M.C. then "sat there stunned" but did not cry. He told her, "[I]f you keep trying to bite me, my punches will get harder and harder." M.C. then released her grip on his arm. Defendant stood up and "cuss[ed] her out." She asked if he was going to break her phone, and he answered that he did not know.

¶ 52   Defendant testified that M.C.'s eye "didn't look bad at first," and they ended up watching television and then went to sleep. She was supposed to be at work at 10:30 p.m., but her eye was getting "worse and worse." Defendant suggested that they both go to the police station and tell them that she was trying to bite him, and he punched her in self-defense. But M.C. wanted to go to work. Defendant told her he did not think she could go to work with her eye "looking like that." He thought she was trying to get away from him to go to the police and tell only her side of the story. He believed he was going to jail because "that eye wasn't going down anytime soon."

¶ 53   Defendant stated that when it was time for M.C. to go to work, he sent the text to Pilgrim stating she had been in a wreck and that her jaw was broken. When Pilgrim called, defendant "let [M.C.] talk to her boss."

¶ 54   Defendant acknowledged that he did not let M.C. leave the bedroom but explained that he did so because he was "afraid." He stated that M.C. was a vengeful person who would get

scissors or a knife to get back at him for hitting her, even though he did so in self-defense.

¶ 55 Defendant denied that he punched M.C. 10 to 15 times but said instead he punched her on the forearm and about 4 times to the face.

¶ 56 Defendant stated that the police ended up calling and he "let her answer the phone." He testified that, before they called, he heard on the police scanner app that he had downloaded onto her phone that they were going to do a "wellbeing check" on M.C. So, he knew the police were coming, and he did not try to leave or run but instead was cooperative.

¶ 57 On cross-examination, the prosecutor displayed a photo of M.C.'s facial injuries, and defendant admitted he caused each of the injuries visible in the photo. He also acknowledged that he was not injured at all.

¶ 58 On redirect examination, defendant described his struggle with M.C. as follows:

"I did not hit [M.C.] 10 to 15 times. I hit her—I gave her a—when she first tried to bite me, I gave her a full arm to the mouth and snatched my arm back. She then tried to bite me a first time, and I punched her right here.

She then tried to bite me a second time, and I punched her right here in like the temple side of the forehead, and I wasn't punching her my hardest. She tried to bite me a third time, and that's when I punched her.

She had on her glasses, and I punched her under the left eye, which simultaneously her glasses, the bruise on the right side of the eye must have came from that punch because she had on her glasses because I didn't never punch her with my left hand, and you see from the evidence that she has visibly no bruising or swelling[ ] to the right side of her face."

¶ 59 2. *The Verdict and Sentence*

- 12 -

¶ 60    The jury found defendant guilty of aggravated criminal sexual assault and domestic battery.

¶ 61    In February 2024, the trial court sentenced defendant to 15 years in prison for aggravated criminal sexual assault and 3 years for domestic battery, to be served consecutively.

¶ 62    This appeal followed.

¶ 63                                    II. ANALYSIS

¶ 64    Defendant appeals, arguing that he was denied a fair trial because, during closing argument, the prosecutor improperly (1) offered his personal opinion on defendant's credibility and guilt, (2) argued that the police officer's decision to detain defendant in handcuffs was circumstantial evidence of defendant's guilt, and (3) shifted the burden of proof by commenting on defendant's failure to produce a witness. We disagree and affirm.

¶ 65    As an initial matter, defendant concedes that he did not preserve his claims of error for appellate review. See *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) ("To preserve claimed improper statements during closing argument for review, a defendant must object to the statements both at trial and in a written posttrial motion."). Nonetheless, he requests that we review his claims under the first prong of the plain-error doctrine.

¶ 66                              A. The Applicable Law

¶ 67                            1. *The Plain-Error Doctrine*

¶ 68    A reviewing court may consider a forfeited error under the first prong of the plain-error doctrine when (1) a clear or obvious error occurred and (2) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 69    The defendant bears the burden of establishing plain error. *Id.* "If the defendant

fails to meet his burden, the issue is forfeited, and [we] will honor the procedural default." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 75.

¶ 70                                    2. *Closing Arguments*

¶ 71          The State "has wide latitude in making a closing argument and may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *People v. Williams*, 2022 IL 126918, ¶ 44. "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122.

¶ 72          "If no objection was made, a prosecutor's statements during closing argument will constitute plain error only if they were ' "so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." ' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 126 (quoting *People v. Phillips*, 127 Ill. 2d 499, 524 (1989), quoting *People v. Albanese*, 104 Ill. 2d 504, 518 (1984)).

¶ 73          Allegations of prosecutorial misconduct are reviewed *de novo*. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 127.

¶ 74                    B. The Prosecutor's Statements Were Not Improper

¶ 75          "The first step in the plain-error analysis is to determine whether a clear or obvious error occurred." *People v. Johnson*, 2024 IL 130191, ¶ 44 (citing *Moon*, 2022 IL 125959, ¶ 22). We address each of defendant's claims of error in turn.

¶ 76                    1. *Personal Opinions Regarding Credibility and Guilt*

¶ 77          Defendant first argues that the prosecutor improperly offered his own opinion on defendant's (1) guilt and (2) credibility when he made the following statements during his closing argument:

"As I told you at the beginning of the trial[,] *** I would present witnesses, I would put in evidence, people would come in, they would testify to their role in this investigation in this, I hesitate to call it an incident, *what I believe is an aggravated criminal sexual assault and domestic battery*, a beating of a person by the man behind me.

* * *

And that applies to him. When he went up there yesterday and told, *as I phrase it, a story*, and as I indicated, he's had a long time. He's had all the reports, every single report, every single video. He's had over two years to come up with a story, and that's what I suggest he did.

He wants you to believe his version, *his, what in my thoughts is an incredible version*, but that's for you to decide based on the evidence, based on the reasonableness of the testimony, based on the demeanor of all of the witnesses who testified. Who do you believe?

* * *

By the way I don't see [Amir] anywhere. *** I didn't see him Monday, the person who would have supported [defendant's] *absurd story*." (Emphases added.)

¶ 78    We disagree that these comments by the prosecutor were improper because they did not constitute a personal opinion regarding defendant's (1) guilt or (2) credibility.

¶ 79    a. The Statements Were Not an Improper Personal Opinion

Regarding Defendant's Guilt

¶ 80    "A prosecutor may not express his personal opinion as to the guilt of the defendant as such an opinion leaves the impression that it is based upon factors not in evidence." *People v.*

*Hill*, 98 Ill. App. 2d 352, 355 (1968) (citing *People v. Provo*, 409 Ill. 63 (1951)). However, "[i]t is not improper for a prosecutor to state an opinion which is based on the record or on a reasonable inference drawn from the evidence." *People v. Bailey*, 249 Ill. App. 3d 79, 83 (1993). "Error cannot be presumed simply because the prosecutor begins a sentence with [the terms 'I think' or 'I believe']." *Id.* at 82. " '[F]or a prosecutor's closing argument to be improper, he must *explicitly* state that he is asserting his personal views, stating for example, "this is my personal view." ' " (Emphasis in original.) *Gilker*, 2023 IL App (4th) 220914, ¶ 130 (quoting *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996)). "[A] prosecutor's statements should not be taken out of context but should be considered in their entirety to determine whether they are statements of personal belief or are based on the evidence presented at trial." *Bailey*, 249 Ill. App. 3d at 83.

¶ 81     In *Bailey*, although the prosecutor used the terms "I think" and "I believe" nine times during his closing argument when commenting on the credibility of the witnesses and weight of the evidence, the Appellate Court, Third District, held that his statements were not improper because, examined in context, they were based on the evidence presented. *Id.* at 83. For example, the court concluded it was not improper for the prosecutor to argue (1) " 'I think you'll find that *** Doug is, far and away, the more believable of the two witnesses' " or (2) " 'I don't think there should be any doubt in your mind in this case as to any of the three offenses that [the defendant has] been charged with, but I believe that there certainly shouldn't be a reasonable doubt of his guilt.' " *Id.* at 82-83.

¶ 82     Similarly, in *Hill*, 98 Ill. App. 2d at 355-56, the Third District held that it was not error for the prosecutor to state, during closing argument, " 'The guilt of the defendant may be obvious to we attorneys, as we listened to the case,' " because the context of the statement made it clear that the prosecutor's opinion was based upon his listening to the evidence, not upon "his

- 16 -

personal knowledge of material at his disposal which had not been introduced into evidence."

¶ 83        In the present case, like in *Bailey* and *Hill*, the context makes clear that the prosecutor's statement—namely, "*what I believe is an aggravated criminal sexual assault and domestic battery*" (emphasis added)—was based on the evidence he had presented to the jury and not his personal knowledge of unintroduced material. The statement was prefaced by the prosecutor's reminding the jury of his promise during his opening statement to present witnesses and evidence to support the charges and was followed by the prosecutor's detailed recitation of that evidence. Accordingly, the prosecutor's statement was not improper.

¶ 84        We note that defendant cites *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982), in support of his argument that the prosecutor offered an improper personal opinion of guilt, but *Whitlow* provides no such support. The *Whitlow* court concluded that the prosecutor's statement in that case was indeed an improper expression of the prosecutor's own belief of the defendant's guilt but did so because the statement "was not based upon any evidence." *Id.* Accordingly, *Whitlow* bears no similarity to the prosecutor's statement in the present case.

¶ 85        We similarly conclude that defendant's reliance on *People v. Love*, 285 Ill. App. 3d 784 (1996), is misplaced. In *Love*, the prosecutor argued, " 'View the evidence. Think about the evidence. We're certain you're going to come to the same conclusion we have come to. He's been proven guilty beyond a reasonable doubt.' " *Id.* at 789-90. The appellate court held that the comment was not improper, reasoning that "the prosecutor said that she had come to the conclusion that defendant was guilty after she summarized the evidence. Her comment clearly was linked to that summary." *Id.* at 790. Defendant contends that *Love* supports his position in this case because, unlike in *Love*, the prosecutor's allegedly improper remarks in the present case came *before* he offered his summary of the evidence. However, the court's reasoning in *Love* makes no such

- 17 -

distinction, and we conclude that any such distinction makes no difference.

¶ 86            b. The Statements Were Not Improper Personal Opinions

Regarding Defendant's Credibility

¶ 87         For the same reasons, we reject defendant's claim that the prosecutor offered improper personal opinions regarding defendant's credibility when he argued that defendant's testimony was an "absurd story" and "incredible version" of events.

¶ 88         " '[I]t is prejudicial error for the prosecutor to express personal beliefs or opinions, or invoke the integrity of the State's Attorney's office, to vouch for the credibility of a prosecution witness.' " *Boling*, 2014 IL App (4th) 120634, ¶ 126 (quoting *People v. Lee*, 229 Ill. App. 3d 254, 260 (1992)). However, "[t]he credibility of a witness is a proper subject for closing argument if it based on the evidence or inferences drawn from it." *People v. Hudson*, 157 Ill. 2d 401, 444-45 (1993) (holding that the prosecutor properly attacked the witness's credibility when he argued, "I think it was obvious what [the witness] was trying to do, a hired agent of this manipulator sitting in front of you today").

¶ 89         Here, the prosecutor's comments that he believed defendant's testimony was a manufactured and unbelievable story, when viewed in context, were based upon the evidence the prosecutor had presented, not on facts or materials unavailable to the jury. Notably, after stating he believed defendant's testimony was an "incredible version," the prosecutor (1) reminded the jurors that it was for them to decide whether to believe defendant based upon their own assessment of the evidence and (2) thereafter recited the evidence supporting M.C.'s version of events over defendant's version of events.

¶ 90         Defendant cites *People v. Hardy*, 77 Ill. App. 3d 37, 40 (1979), and *People v. Clay*, 124 Ill. App. 3d 140, 150 (1984), in support of his argument that the prosecutor improperly

- 18 -

attacked his credibility. However, neither case lends support to defendant's argument. In *Hardy*, the Third District held that the prosecutor's comments in that case were improper, but nowhere in the opinion did the court identify what the prosecutor actually said that was improper. *Hardy*, 77 Ill. App. 3d at 40. Because we do not know which statements were improper, *Hardy* offers this court no assistance in analyzing whether the statements here were similarly improper.

¶ 91        *Clay* is similarly unhelpful to our analysis. In *Clay*, the prosecutor argued that the defendant's case was " 'the biggest bunch of double-talk I've ever heard in my life' " and prefaced other remarks with, " 'I don't know why he's even trying to sell you that,' " and " 'It's hard for me to believe.' " *Clay*, 124 Ill. App. 3d at 150. On appeal, the appellate court concluded that it was "improper for the prosecutor to interject his personal opinions as to the evidence," but did not offer any further analysis. *Id.* The court focused instead on the overwhelming evidence of the defendant's guilt, concluding that the improper comments could not have materially affected the outcome of the trial. *Id.* Like *Hardy*, *Clay* lacks necessary contextual information about the prosecutor's statements that would allow for a useful factual comparison between it and the present case.

¶ 92        Defendant also directs this court's attention to *People v. Schaefer*, 217 Ill. App. 3d 666, 668 (1991), in which the prosecutor argued as follows:

> " 'Ladies and gentlemen, as State's Attorney, it is not at all uncommon that I do get people who come in and tell me lies. And I hear a lot of different versions of stories. And I think—I guess, I hope, after 5 years or so, I can kind of cut through the BS and have a way to find out who is telling the truth.
>
> ***
>
> What [the witness] said at the police that night was sustained in all respects

by what we found that night when we searched [the defendant's] residence. So, he was saving his butt, but he told the truth.

*** 

[The witness] is not the most stellar person in the universe but I think he told the truth.' "

¶ 93 On appeal, the appellate court held that the prosecutor's statements were "clearly improper" because he "clearly implied that he 'knew' [the witness] was telling the truth based upon his experience as a State's Attorney." *Id.* at 669.

¶ 94 Defendant contends that *Schaefer* supports his argument that the prosecutor's statements in the present case were improper. We disagree. *Schaefer* instead highlights the obvious difference between comments that (1) improperly invoke the prosecutor's experience and authority and (2) properly draw inferences from the evidence. The comments at issue in the present case are clearly the latter and not the former. The prosecutor in the present case did not refer to his authority or experience as a prosecutor but instead simply pointed out that defendant's version of events was not believable as part of a longer argument about the evidence presented.

¶ 95 For all the foregoing reasons, we conclude that the prosecutor did not offer improper personal opinions regarding defendant's guilt or credibility.

¶ 96 2. *Comments Regarding the Police Officer's Handcuffing Defendant*

¶ 97 Defendant next argues that the prosecutor improperly argued that Waid's decision to handcuff defendant on the porch after seeing M.C.'s injuries was circumstantial evidence of his guilt. Specifically, the prosecutor stated the following:

"Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict, so even though there was no

- 20 -

video camera in that bedroom throughout those 24, 22 hours of July 6th into a few minutes before midnight, we do have circumstantial evidence.

*You have the way [M.C.] appeared as soon as the officer walked up those stairs and saw her, saw the condition she was in, knew immediately I'm putting that guy downstairs, the defendant, in cuffs so that my partner knows what's going on. She went right downstairs.*

Circumstantial evidence, all of the bruising, and those medical records are in evidence that Nurse Ince testified to, the same worksheet that she filled out, and I took her through that. She testified to all of the locations, and there's even handwritten notes showing all of the areas on her body." (Emphasis added.)

¶ 98        Defendant asserts that these comments by the prosecutor "encouraged the jurors to rely on *** Waid's decision to detain, and ultimately arrest, [defendant] as substantive evidence of his guilt and to M.C.'s believability." We disagree.

¶ 99        Defendant correctly asserts that, generally, (1) "an 'arrest is not evidence' " (quoting *People v. Attaway*, 41 Ill. App. 3d 837, 850 (1976)), (2) a police officer may not offer a present opinion of a defendant's guilt while testifying at trial (citing *People v. Suggs*, 2021 IL App (2d) 190420, ¶ 18), and (3) a prosecutor may not argue that a police officer's testimony regarding his decision to arrest a defendant is substantive evidence of the defendant's guilt (citing *People v. Williams*, 159 Ill. App. 3d 612, 620 (1987)).

¶ 100       However, none of the foregoing occurred in the present case.

¶ 101       On direct examination by the prosecutor, Waid testified as follows:

"Q. Now, at the point that you are handcuffing the defendant at approximately four minutes into your body worn camera [video recording], what

was your purpose in doing it at that particular time?

A. At that time I was just detaining him so I could figure out what was going on, and obviously she had said that—or her face was all bruised. I didn't want him [(defendant)] alone with the other officer outside for just officer safety reasons, so we secured him in the car so I could further my investigation."

¶ 102    The prosecutor then asked Waid further questions about the investigative steps that she took. In response, Waid testified that she obtained additional information from M.C., called for an ambulance, took photographs of M.C.'s door, and collected M.C.'s pajamas and bedding. Waid then testified as follows:

"Q. And after that was collected, what did you do?

A. I transported [defendant] to the police department and put him in an interview room for detectives.

Q. So, following the transport of the defendant to the Peoria Police Department, did you have any other role in the investigation of this incident, Officer?

A. No."

¶ 103    Waid's testimony is important to place the prosecutor's argument in proper context. Waid testified that she detained defendant for safety reasons after seeing M.C.'s injuries and then transported him to be interviewed by detectives. Put another way, Waid was concerned that someone was injured, she needed to get to the bottom of it by investigating, and she did not want the other officer to be unsafe while she figured out what had happened. Waid did not testify that she placed defendant in handcuffs because she was arresting him for a crime or that she believed he was guilty of a crime.

¶ 104     We now examine what the prosecutor argued relating to Waid's testimony. During closing argument, the prosecutor asserted that he had presented circumstantial evidence of defendant's guilt, which was "the way [M.C.] appeared as soon as the officer walked up those stairs and saw her, saw the condition she was in." That is to say, the circumstantial evidence the prosecutor referred to was M.C.'s injuries, *not* Waid's decision to detain defendant for safety reasons while she further investigated what had occurred.

¶ 105     The prosecutor's next words—"[Waid] knew immediately, I'm putting that guy downstairs, the defendant, in cuffs so that my partner knows what's going on"—referred to Waid's reaction upon seeing M.C.'s facial injuries and served to emphasize for the jury the severity of those injuries. The severity of M.C.'s injuries compared against defendant's lack of injuries served as a central theme in the prosecution—namely, to negate defendant's testimony and theory of the case that the sexual conduct was consensual and he caused the injuries in self-defense. Moreover, the statement was brief and simply repeated Waid's testimony, which, as we have already explained, was not an improper opinion of guilt.

¶ 106     Accordingly, examining the comments in their full context, we reject defendant's position that the prosecutor improperly argued that Waid's detention of defendant served as circumstantial evidence of defendant's guilt. We instead conclude that the prosecutor properly argued that M.C.'s injuries, and Waid's reaction to them, constituted circumstantial evidence negating defendant's claims that (1) the sexual conduct was consensual and (2) he caused the injuries only in self-defense.

¶ 107     3. *The Prosecutor's Commentary on Defendant's Ability To Call a Witness*

¶ 108     Defendant next argues that the prosecutor improperly shifted the burden of proof to defendant by commenting on defendant's failure to call Amir as a witness. Specifically,

defendant points to the following statement: "By the way I don't see [Amir] anywhere. *** I didn't see him Monday, the person who would have supported [defendant's] absurd story."

¶ 109    In context, defendant asserted during his closing argument that M.C.'s testimony about the sequence of events and how many times he had punched her was false and his testimony was true. In support, defendant argued that M.C. never told the police about Amir coming to collect the rent because Amir would have rebutted her version of events. Specifically, defendant argued, "If you remember, both me and [M.C.] testified that [Amir] came to the house July 6, 2021, [at] approximately 10:00 a.m. to pay his rent." M.C. had testified that, by this time, defendant had already punched her in the head 10 to 15 times; defendant had testified that he had not yet punched her. Defendant acknowledged that he and M.C. had testified differently about who went down to collect the rent money, but he asserted that either way, if she was truly injured and being held against her will at 10 a.m., when Amir arrived, M.C. could have obtained Amir's help by either (1) asking him directly when she took the rent money from him or (2) yelling from upstairs when defendant took the rent money from Amir. Defendant asserted that she did neither and argued, "This is the reason why [M.C.] never mentioned to Officer Waid or Officer Miller that [Amir] came into the house to pay his rent in any of the statements that she made to police because she didn't want him to be called as a witness."

¶ 110    In rebuttal, the prosecutor responded as follows:

"[Defendant] also said that [M.C.] knew that [Amir,] who was paying rent[,] had come over. No, she didn't. She testified, even on cross-examination, she didn't know he was over there. She said if he was over there, it was probably when [she] was sleeping[,] is exactly what she testified to. She didn't know that person had come over.

- 24 -

By the way, I don't see [Amir] anywhere. I don't see [Amir]. I didn't see him yesterday. I didn't see him Monday, the person who would have supported this man's absurd story. I don't see him even now. I submit [Amir] would not have supported the defendant's version that it was [M.C.] who came down [to collect the rent money]."

¶ 111 In his brief to this court, defendant argues that these last comments by the prosecutor "improperly indicated that [defendant] should not be believed because he failed to produce the one occurrence witness that could have supported his 'absurd story.' "

¶ 112 We disagree that the prosecutor's comments were improper.

¶ 113 " 'The defense is under no obligation to produce any evidence, and the prosecution cannot attempt to shift the burden of proof to the defense.' " *People v. Curry*, 2013 IL App (4th) 120724, ¶ 80 (quoting *People v. Beasley*, 384 Ill. App. 3d 1039, 1047-48 (2008)). "However, a prosecutor may respond to comments by defense counsel that clearly invite a response. *Id.* "Moreover, a prosecutor is permitted to comment on a defendant's failure to produce evidence where a defendant with equal access to the evidence assails the prosecutor's failure to produce the evidence." *Id.*

¶ 114 In the present case, it was defendant who first raised the issue of Amir's absence as a witness at trial when he insisted that M.C. did not tell the police about Amir coming to collect the rent because he would have rebutted her version of events. Because defendant was in an equal position to secure Amir's attendance at trial, defendant invited the State's response that defendant had not called Amir either. "[W]hen defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial." *Hudson*, 157 Ill. 2d at 445. Accordingly, we conclude that the prosecutor's comments were not improper.

¶ 115 Because defendant has not established that any of the prosecutor's comments constituted clear or obvious error, plain error does not apply, and we honor his procedural default.

¶ 116                    C. The Evidence Was Not Closely Balanced

¶ 117 Even if we concluded that the prosecutor's statements constituted clear and obvious error—which we do not—defendant's argument for first-prong plain error would still fail because the evidence in this case was not closely balanced. See *People v. Maury*, 2025 IL App (4th) 220887, ¶ 93 ("If either prong of the plain error doctrine is not met, then a defendant's plain error claim fails.").

¶ 118 A defendant alleging first-prong plain error bears the burden of demonstrating both that (1) a clear or obvious error occurred *and* (2) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 16. When determining whether the evidence was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 119 Typically, the evidence is closely balanced if "the outcome of [the] case turned on how the finder of fact resolved a 'contest of credibility.' " *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A "contest of credibility" exists when (1) both sides present opposing versions of events and (2) there is no extrinsic evidence to corroborate or contradict either version. *Id.* "Courts have found no 'credibility contest' when one party's version of the events was either [(1)] implausible or [(2)] corroborated by other evidence." *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35.

¶ 120 The evidence in the present case was not closely balanced. Although M.C. and defendant presented competing versions of events, the State presented other evidence that

- 26 -

corroborated M.C.'s version over defendant's version. For example, (1) M.C.'s serious facial injuries supported her testimony that defendant punched her 10 to 15 times in the face; (2) the photographs of M.C.'s broken bedroom door corroborated her testimony that she had locked her door and defendant forced his way in; (3) Ince's testimony about M.C.'s statements to her during the sexual assault examination were consistent with M.C.'s testimony; (4) Ince's testimony about M.C.'s statements regarding where on her body and how she was sexually assaulted were consistent with the results of Maciejewski's DNA analysis; (5) Miller's and Ince's descriptions of M.C.'s appearance and demeanor at the hospital were consistent with her account of having been physically and sexually assaulted; and (6) Pilgrim's testimony that M.C.'s absence from work was abnormal because she was dependable and communicated well supported M.C.'s testimony that defendant took control of her phone and held her against her will.

¶ 121        We also note that defendant's own admissions corroborated important parts of M.C.'s testimony. For instance, defendant admitted (1) taking control of M.C.'s phone to text Pilgrim, (2) breaking down M.C.'s door, (3) punching M.C. four times in the face and holding her down, and (4) preventing M.C. from leaving her bedroom. We emphasize defendant's admission of texting Pilgrim as M.C., showing he acted dishonestly and manipulatively. Additionally, defendant's admission that he caused each of M.C.'s multiple injuries, while he suffered no injuries, renders implausible his claim that he injured M.C. in self-defense.

¶ 122        For the foregoing reasons, we conclude that the evidence was not closely balanced. Because defendant has not shown that (1) any clear or obvious error occurred and (2) the evidence was closely balanced, plain error does not apply, and we affirm the judgment of the trial court.

¶ 123                                    III. CONCLUSION

¶ 124        For the reasons stated, we affirm the trial court's judgment.

¶ 125      Affirmed.