2025 IL App (4th) 241322-U

NO. 4-24-1322

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
August 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cass County |
| JEAN C. SANTIAGO-NIEVES, | ) | No. 24CF33 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Wessel, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, finding the State's closing remarks did not constitute plain error and the trial court's decision to admit photos from the victim's autopsy was not an abuse of discretion.

¶ 2    Defendant, Jean C. Santiago-Nieves, was charged with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2024)) in connection with the May 2024 shooting death of Steven Dominguez. Following a jury trial, he was found guilty on both counts and sentenced to 45 years in the Illinois Department of Corrections. He appealed, arguing he was denied a fair trial where (1) the State made numerous improper comments during its closing and rebuttal arguments and (2) the trial court allowed the State to show multiple graphic autopsy images of Dominguez to the jury, despite the fact that defendant was willing to stipulate to the cause of death.

¶ 3    For the reasons stated below, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5            On June 3, 2024, defendant was charged by information with two counts of first degree murder for discharging a firearm that killed Steven Dominguez. See *id.* On June 25, 2024, defendant filed a notice of affirmative defense, stating his intent to assert the defense of self-defense. See *id.* § 7-1(a).

¶ 6            A four-day jury trial began on August 5, 2024. Marvin Garcia, an employee of Cass County 911, testified that he received a call on the morning of May 31, 2024, from defendant stating he had just shot someone in the head. Defendant mentioned a monetary dispute between the two parties and stated repeatedly that Dominguez had threatened to shoot him. Garcia told defendant to comply with the police when they arrived, and defendant informed Garcia that he had placed the gun on a dresser in his home and disarmed it.

¶ 7            Officer Jacquelyn Birdsell and Chief of Police Martin Coad responded to a call of "shots fired" on that morning. Officer Birdsell testified that when she arrived on the scene, she observed a white Nissan Sentra parked near a residence, still running, with an unresponsive male occupant in the driver's seat, with a "wet red substance going down his face." Defendant walked out of the residence with his hands up and complied with orders to get on the ground. Chief Coad testified that he found the gun where defendant advised it would be, along with three magazines loaded with .22-caliber ammunition and a single loose cartridge.

¶ 8            At trial, the defense and the State stipulated that Officer Travis Capps was also dispatched to the scene that morning and that he looked through the window of Dominguez's vehicle for weapons and did not see any in view.

¶ 9            Adam Markwell, a crime scene investigator, testified that he took photos of the crime scene that morning, including the interior and exterior of defendant's nearby residence.

These photos showed an indoor cannabis grow tent with several potted plants.

¶ 10       Markwell further testified that he recovered multiple fired cartridge cases from inside and outside of Dominguez's vehicle. On cross-examination, he acknowledged that not all of the cases came from the shooting that morning. He stated there was no firearm located anywhere in the vehicle but acknowledged there were two large cardboard boxes in the trunk that he did not open, stating, "They appeared to be food related items." Markwell also photographed an empty beer bottle on the floorboard of the vehicle's front passenger seat and two full beer bottles in the front passenger seat.

¶ 11       The State sought to elicit testimony from Dr. Nathaniel Patterson, who had performed Dominguez's autopsy. Defense counsel objected to Dr. Patterson's testimony based on a lack of relevance. Counsel stated, "The defense has never denied that [defendant] fired the weapon, nor argued the way that the alleged victim died. We simply are here, Your Honor, arguing why he died and that was simply because my client was in fear of his life." The State responded:

> "I respect the defense objection, but it is the State's case to present. If the State doesn't present its case and check off the boxes we need to prove that [defendant] murdered Mr. Steve Dominguez, the defense will then say, Well, does the State have to prove that? It's the State's case. We have the right to present it as we wish and would ask you to deny the objection, Your Honor."

The trial court allowed the testimony of Dr. Patterson and qualified him as an expert over defense counsel's objection.

¶ 12       Dr. Patterson testified that he was a forensic pathologist and performed the autopsy on Dominguez. When asked, he confirmed that the purpose of any autopsy is to determine the cause of death. As part of his examination, Dr. Patterson took photos of Dominguez, which the

State moved to admit into evidence and publish for the jury. Defense counsel renewed her objection, again arguing relevance. The State asked Dr. Patterson, "Would viewing these photos help you explain your testimony and your opinion to the jury?" Dr. Patterson responded, "Yes." Over defense counsel's objection, the trial court admitted the photos and published them to the jury, warning they were graphic and could cause great emotion. The photos showed multiple angles of Dominguez's face and the five gunshot wounds he sustained, including one on his left temple, two near his left eyebrow, one on the left side of his nose, and one on his left cheek. One photo showed his scalp pulled back and the hemorrhaging on his skull. Dr. Patterson stood next to where the photos were displayed and pointed to them as he testified.

¶ 13 Dr. Patterson explained that when a gun is fired, small particles from the gun smoke and unburnt powder are deposited on the skin. Dr. Patterson testified that all of Dominguez's wounds had gun powder residue apart from the one on his temple, which was blocked by the hat Dominguez was wearing that the time of his death He stated that the presence of gun powder residue indicated the gunshots were fired at a close range. Additionally, the two shots on Dominguez's eyebrow being so close together indicated he was either not moving when he was shot or the shots were fired in rapid succession.

¶ 14 Dr. Patterson testified that he recovered fragments of five bullets from the Dominguez's head. He stated his belief that Dominguez was shot in the head five times and the shots caused his death. On cross-examination, he acknowledged that his examination could not reveal whether the shots were fired in self-defense. The parties stipulated that, as part of Dr. Patterson's autopsy, a toxicology screening was performed that showed Dominguez was under the influence of cannabis and alcohol at the time of his death.

¶ 15 Kathryn Doolin, a forensic scientist specializing in firearm identification, testified

that based on her examination of the fired cartridge cases and bullet fragments, they were fired by defendant's gun.

¶ 16        Special Agent Bradley Long testified that he conducted an interview with defendant at the police station. A video of the interview was shown to the jury. In the video, defendant explained that he had known Dominguez for approximately two years and knew him to carry guns. Defendant was taking classes for cannabis seed cultivation, and Dominguez wanted to enter into a business with him. Defendant did not want to enter into a business because Dominguez lacked the proper certifications, but he said he would help him grow five cannabis plants within regulation.

¶ 17        Defendant stated that hostility between the two began on May 17, 2024. He explained that he and Dominguez would loan each other money and he had recently borrowed $200 from Dominguez. He was later hired at Home Depot and, with his first paycheck, went to Dominguez's home to pay him the money he owed. However, defendant stated that when he arrived, Dominguez demanded $2,000, as opposed to $200, and began threatening defendant and his family. Defendant stated he had no contact with Dominguez between May 17, 2024, and May 24, 2024. On May 24, Dominguez called defendant to demand repayment and continued making threats on defendant's life. Defendant also stated he and Dominguez communicated via texts and phone calls, but Dominguez only ever threatened him in person or during a call, never in texts. Defendant stated he did not tell anyone about the threats he received.

¶ 18        On May 31, 2024, defendant and Dominguez had a conversation that, according to Agent Long, "was kind of broken between text and calls." In the early morning, defendant received a text from Dominguez saying "something along the lines of, you know, Don't take too long." Defendant responded that he would pay the money back, but he would need time, as it was a large amount. He also informed Dominguez that some cannabis seeds he had ordered for him had just

come in. Dominguez told defendant he was going to come over to his house to talk, and defendant gave him times that he could come so as not to interfere with defendant's work schedule.

¶ 19    At 7:03 a.m., defendant received a text from Dominguez saying he was at defendant's residence. Defendant told him to come to the home's back door, but Dominguez declined. Defendant said he then went upstairs, retrieved his firearm, loaded it, and put it in his waistband. He left the house and approached Domginuez's vehicle on the driver's side. According to defendant, Dominguez again demanded money and made threats. Defendant saw Dominguez lean forward and heard the sound of the trunk popping open. Dominguez then moved to exit the vehicle, but defendant pushed the door shut. He stated that Dominguez then began to rifle around in the car's center console, which made him nervous. He drew his pistol and, according to Agent Long's recollection, "told him, you know, not to do it, don't reach for it." According to defendant, Dominguez cursed at him and "kind of quickly lifted his arm," and defendant shot him. After firing five rounds, he went back into his residence and called 911. When asked if he believed defendant when defendant told him that he thought Dominguez would kill him, Agent Long testified that he did.

¶ 20    The parties stipulated that Kip Baumann, a digital forensic examiner with the Illinois State Police, extracted digital data from defendant's phone and that copies of the data report were given to Special Agent Sergio Rodriguez.

¶ 21    Agent Rodriguez testified that he reviewed defendant's text messages beginning around May 17, 2024, when defendant stated the first threat was made. Rodriguez translated the messages from Spanish to English. The parties exchanged text messages on May 20, 2024, discussing the sale of cannabis and the maintenance of good clients, and messages sent on May 19 indicate that Dominguez went to defendant's home. Photos were admitted from defendant's phone

including one showing defendant posing and smiling with Dominguez amidst a large number of cannabis plants, as well as one showing defendant hugging one pot with a cannabis plant growing. Rodriguez testified that these photos were taken between March and late May. He further testified that in defendant's interview, he denied being in an illegal cannabis business with Dominguez.

¶ 22        The text log included messages from defendant stating he wanted to leave the business with Dominguez and move to New York with his family. Agent Rodriguez stated that these conversations started around May 20 or 21, 2024. On May 21, defendant messaged, "Don't germinate more seeds after, I am going to leave the business, I am leaving to New York, so let everyone come out. I will come over for my things because the woman and I are tired of this town, Bro." Dominguez responded, "Now, Bro, I have a lot of time invested, what do you mean that you're going to leave the business?" A few seconds later, he added, "It's going to be a loss for you." Agent Rodriguez also testified that defendant made a Google search for "DNA" on approximately May 30, 2024. He stated his opinion that the text messages he observed did not appear threatening.

¶ 23        Agent Rodriquez also extracted videos of Dominguez from Facebook. One video showed Dominguez drinking while driving early on the morning of the shooting. Another video showed him firing what Agent Rodriquez believed appeared to be an AK-47 assault rifle.

¶ 24        The State then rested its case. Defendant then moved for a directed verdict, which was denied.

¶ 25        Terry Comiskey, the chief deputy with the Cass County Sheriff's Office, testified that when he approached Dominguez's vehicle at the scene of the shooting, he could smell the odor of alcoholic beverages coming from inside the car.

¶ 26        Alexandro Soria testified that he was a former coworker and friend of defendant. He stated that on May 24, he was at defendant's house when defendant received a call from Dominguez. Soria testified that he could hear through the phone that Dominguez was upset. After the call, he spoke with defendant about the trouble he was having with Dominguez. He stated that defendant said the two

> "started off cool, you know, saying how he was helping him with stuff and then stuff started getting out of hand. So he started trying to part out and I guess there was some money involved but he—[defendant] told me there was no money involved, that he didn't owe no money but [Dominguez] kept saying that he owed him money."

¶ 27        On cross-examination, Soria acknowledged he had previously spoken to the state's attorney and, when asked to disclose all he knew about defendant, had not mentioned the phone call on May 24. Soria explained, "I mean, it ain't come to my head." The following exchange then took place:

> "[PROSECUTOR]: Okay. You didn't tell me this previously, right?
>
> [SORIA]: No.
>
> Q. You didn't tell law enforcement this, correct?
>
> A. No.
>
> Q. But this would be something really important, you'd think you would tell somebody if your buddy was on trial for murder, right?
>
> A. Yeah, it would."

¶ 28        Soria further denied ever selling cannabis with defendant or texting with defendant about the sale of cannabis:

"Q. I didn't sell no cannabis with [defendant].

A. That you and [defendant] had telephone conversations on texts about selling cannabis, correct?

A. No, I did not.

Q. Would it surprise you to learn that we know, that we have the defendant's cell phone extraction, exactly what texts are on his phone?

A. (No verbal response.)

Q. Is that a yes?

A. Yeah.

Q. Would it surprise you to know that through that extraction there are messages between you and [defendant] discussing illegal cannabis buying and selling?

A. Hum.

Q. I'm sorry, what was that answer?

A. Maybe awhile back maybe but not recently.

Q. Okay, awhile back, May of 2024?

A. May 2024? I don't remember."

¶ 29    Before closing arguments, defense counsel made a motion for the lesser-included charge of second degree murder to be presented to the jury. The trial court found defendant had made a *prima facie* case and it was in the interest of justice that the lesser-included offense be presented to the jury.

¶ 30    The parties then presented their closing arguments. The State began its closing argument by stating:

"So, ladies and gentlemen, what I have to prove as the State—and this (indicating) is what's called a proposition page. I'll read this verbatim to you. How I treat this or when I'm charging a case to see if I can prove it beyond a reasonable doubt is I treat it like a grocery list, like I'm going to Walmart, Hy[-]vee, or someplace like that, and I will literally go through and check off what I'm able to prove. So that's what I'll go through with you with these instructions."

The State emphasized that defendant did not tell anyone about the alleged threats he was receiving from Dominguez, apart from Alexandro Soria. In addressing Soria's testimony, the State said:

"I guess you had Alex Soria sit up there and tell you he heard something, but when you judge the credibility of witnesses, he's not one I would put a lot of weight into. I would not believe anything Alex Soria said. He wouldn't—based on his testimony, he wouldn't know the truth if it hit him in the face."

¶ 31 In its rebuttal, the State remarked on defendant's version of events, noting certain inconsistencies. The State argued:

"In *** the interview, [defendant] said [']I didn't speak with him from May 17th to May 24th.['] Those text messages, Facebook messages, Instagram messages say otherwise. That's a lie. [']I'm not in a real business with Steve, I don't have time for illegal business, I don't know what he does with the weed.['] Lie after lie after lie. So ***we start talking about honesty here, who's really being honest? That man (indicating) at the end of the table is not being honest.

He told police on April 23rd, [']I saw more than five plants and I wanted out of this business.['] Well, you saw videos and pictures of the real defendant. He didn't tell police about that. He was in a business, an illegal business with Steven

- 10 -

Dominguez. [']I never sold anything I didn't create[']; lie. [']The last time I saw him was on May 17th.['] Again, go through these text messages. You'll get to see there's texts in there about [defendant] going over to Steve's house after May 17th. A lie.

So ladies and gentlemen, when you judge the credibility of a witness, those that you saw up on *** the stand, on the screen, you don't get to cherry-pick things. You can't say I like some of the things he said over here, but over here, he's a dirty rotten liar. You have to take everything as a whole in the context. It's either all true or it's all a lie, and that man down there (indicating) lies like a rug, ladies and gentlemen."

¶ 32    The State concluded with the following statement:

"Ladies and gentlemen, I will leave you with this, and then I promise I *** will be done talking, but this case, the decision you make today, holds immense weight, not just for this case, but the principles of justice and the safety in our society, everyone here. The fact that—imagine a world where an individual can do just what we've been talking about, take his firearm outside the safety of his home, go to the fight, no threats, take himself out there to shoot this individual five times all while claiming these alleged threats; not through the phone; unjustified. There's no evidence of these. Is that *** the type of society that we want to live in where no evidence, baseless claims of threats, justifies cold-blooded killing of an individual in his car? I submit to you, no, that this is not justified. That what he did is not self-defense. That's what the evidence shows. It's not and you shouldn't find as such.

\*\*\*

Today you have the power to deliver justice for the victim, for Steve Dominguez, and to uphold the principles that protect us all. Your verdict must reflect the truth of what—what actually happened. Not a tale, not fable. Let your decisions speak for the value of human life and the integrity of our legal system. Justice for Steven Dominguez demands a verdict of first-degree murder, ladies and gentlemen."

¶ 33    The jury found defendant guilty of first degree murder and found that he personally discharged a firearm that proximately caused death to another person.

¶ 34    On August 27, 2024, defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred in overruling his objection to Dr. Patterson's testimony and the admittance of the autopsy photos because the defense stipulated to Dominguez's cause of death. He asserted that the photos were unduly prejudicial and served no other purpose than to unduly inflame the emotions of the jury. At a hearing on the motion, the State argued:

"[I]t's the State's case to prove, and we do not have to stipulate to cause of death, and I believe the pictures were not prejudicial; in fact, the doctor used those to describe the cause of death.

The pictures that the State used were actually pared down quite a bit down from all of the doctor's medical photos."

The court stated that it still believed the probative value of the photos outweighed any prejudicial effect and denied defendant's motion.

¶ 35    Defendant was sentenced to 20 years in the Illinois Department of Corrections with a 25-year gun enhancement, for an aggregate sentence of 45 years.

¶ 36    This appeal followed.

¶ 37                    II. ANALYSIS

¶ 38                A. The State's Closing Remarks

¶ 39    Defendant first argues the State made numerous improper comments during its closing and rebuttal arguments that deprived him of a fair trial. He acknowledges he failed to preserve this issue but argues it is reviewable as first-prong plain error.

¶ 40    Generally, an error must be objected to at trial and raised in a posttrial motion in order to be preserved for review. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). However, the plain-error doctrine bypasses normal rules of forfeiture and allows a reviewing court to consider unpreserved error when a clear error occurs and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that if affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* The first step in a plain-error analysis is determining whether an error occurred. *Id.* at 203-04.

¶ 41    "The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict." (Internal quotation marks omitted.) *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Prosecutors are generally given wide latitude in making closing arguments. *Id.* They may comment on the evidence and any fair, reasonable inferences it yields, even if those inferences reflect negatively on the defendant. *Id.* However, there are limits to the statements a prosecutor may make. "A closing argument must serve a purpose beyond inflaming the emotions of the jury." *Id.* Prosecutors also may not argue facts or assumptions that are not contained in the record. *Glasper*, 234 Ill. 2d at 204. Nor may they

- 13 -

express personal opinions as to the guilt of the defendant where such an opinion leaves the impression that it is based upon personal knowledge not in evidence. *People v. Manning*, 2025 IL App (4th) 240485-U, ¶ 80. They may, however, state an opinion that is based on the record or on a reasonable inference drawn from the evidence. *Id.* They may also comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, as long as that argument is based upon competent and pertinent evidence. *Nicholas*, 218 Ill. 2d at 121-22. A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in context. *Id.* at 122.

¶ 42        Here, defendant takes issue with numerous comments made by the State during closing and rebuttal arguments. We will discuss each of the allegedly improper statements in turn.

¶ 43        Defendant argues the prosecutor improperly interjected his own opinions into closing arguments when he made the following statements: "[W]e, the State, believe that the defendant has committed first-degree murder. We believe all of the evidence that you have seen and heard bears that out in this case"; "I think we can all agree that [defendant] used that .22[-]caliber Glock to cause the death of Steven Dominguez"; and "I believe the evidence shows the defendant guilty beyond a reasonable doubt and that his use of that firearm caused the death of Steven Dominguez."

¶ 44        We do not find these statements improper. A prosecutor may state an opinion that is based on the record in evidence. *Manning*, 2025 IL App (4th) 240485-U, ¶ 80. Here, although the prosecutor used the words "I" and "we" and framed his argument in terms of what he "believed" the evidence showed, his statements were nevertheless proper comments on the evidence presented at trial. See *id.* (stating that error cannot be presumed simply because a prosecutor frames his statements in terms of what he thinks or believes). He did not suggest he

was stating an opinion based on matters not in evidence; his statements tied directly back to the evidence before the jury. See *id.* ¶ 83. We therefore find no error in these statements.

¶ 45          Defendant also argues the State improperly inserted its personal opinion on Alexandro Soria's credibility. Again, we disagree. Although the prosecutor said Soria was a witness that he would not "put a lot of weight into" and that he did not believe anything Soria said, we must look at these statements in context. After stating that he did not believe Soria, the prosecutor went on to state, "He wouldn't—*based on his testimony*, he wouldn't know the truth if it hit him in the face." (Emphasis added). We again find this to be a permissible comment on the evidence presented at trial, specifically Soria's testimony, which was at times contradictory. See *id.* ¶¶ 88-89 (finding the prosecutor's comments on the defendant's lack of credibility were proper because they were based on the evidence presented at trial).

¶ 46          Defendant next argues the State improperly suggested it only brought charges in the instant case because defendant was in fact guilty, which he claims tempted the jurors to ignore their fact-finding duties. He points to the following statement made by the prosecutor:

> "So, ladies and gentlemen, what I have to prove as the State—and this (indicating) is what's called a proposition page. I'll read this verbatim to you. How I treat this or when I'm charging a case to see if I can prove it beyond a reasonable doubt is I treat it like a grocery list, like I'm going to Walmart, Hy[-]vee, or someplace like that, and I will literally go through and check off what I'm able to prove. So that's what I'll go through with you with these instructions."

¶ 47          Again, we find this to be proper commentary on the evidence presented at trial and what the State believed it would show. The prosecutor did not suggest, based on his personal experience as a prosecutor, that he specifically chose to charge this case over another based on the

weight of the evidence against this particular defendant. Nor did he ask the jurors to accept his conclusions in place of their own. A prosecutor is allowed to argue that the evidence presented proves the defendant's guilt beyond a reasonable doubt with respect to each element of the crime. We find no error.

¶ 48    Defendant next argues that the State attempted to sway how the jury conducted its credibility determination by saying of defendant's statements: "You have to take everything as a whole in the context. It's either all true or it's all a lie, and that man down there (indicating) lies like a rug, ladies and gentlemen." Defendant asserts, "There is no binary where a witness'[s] testimony is either wholly comprised of the truth or of lies. And the jurors are free to find that a particular witness is lying about some aspect of their testimony and telling the truth about another."

¶ 49    Defendant is correct that the jury is entitled to accept certain statements of a party and reject others. However, we do not find that the prosecutor's statement would have misadvised the jury on that principle and suggested they could only accept the entirety of defendant's statements or reject them. Rather, we find the prosecutor's remarks were acceptable comments on defendant's credibility, based on the evidence presented at trial. For example, defendant told the police that he did not speak to Dominguez from May 17 to May 24, after Dominguez allegedly threatened him. Yet text messages recovered from his phone showed the two speaking and even meeting up during this time. The State also, in making the statement defendant takes issue with, inferred from the photos of defendant and Dominguez posing with dozens of cannabis plants that the two were participating in an illegal cannabis business, which defendant had previously denied to the police. Considering the context of the prosecutor's statements, we conclude the prosecutor was merely urging the jury to consider the evidence as a whole and conclude that if defendant lied about one aspect of his story, then all of the other assertions he made were also called into question.

As stated, a prosecutor may attack a defendant's credibility in his closing argument. *Glasper*, 234 Ill. 2d at 207 ("However, it is not error for the State to challenge a defendant's credibility or the credibility of his theory of defense when evidence exists to support the challenge."). We therefore find no error.

¶ 50    Defendant also argues that the prosecutor made improper comments in his rebuttal argument. Specifically, he argues the prosecutor attempted to incite and inflame the passions of the jurors by making comments about Dominguez's family. In his rebuttal, the prosecutor stated:

> "The one thing I don't like about being a prosecutor is I never get to meet the people who've died. I get to meet their family. I get to suffer, not like they do, but I'm the one who's responsible for deciding and showing how that man murdered one of their family members, and all the evidence in this case shows that that man (indicating) murdered Steven Dominguez."

¶ 51    "[J]ury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper." *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). However, where references to a victim's family made during closing argument are fleeting and no effort is made to correlate the defendant's punishment to the suffering of the family, our supreme court has found no error. *Id.* at 372.

¶ 52    We find this to be the situation in the instant case. Here, the prosecutor's reference to Dominguez's family was brief and ultimately immaterial. He stated the family suffered with Dominguez's death and that his own suffering was less than theirs. However, viewing the closing remarks as a whole, it appears the reference to Dominguez's family was merely a rhetorical stepping stone to the prosecutor's assertion that the State bore the burden of proving that the evidence showed defendant murdered him. The prosecutor did not dwell on the effect that

Dominguez's death had on his family and did not argue that defendant's punishment should, in some way, seek to remedy their suffering. See *People v. Bertall*, 98 Ill. 2d 294, 322 (1983) (finding a prosecutor's demand that a jury reach a verdict and then tell it to the family of the victim was improper). We find no error.

¶ 53 Finally, defendant argues that the following statement made by the prosecutor in his rebuttal argument was error:

"Ladies and gentlemen, I will leave you with this, and then I promise *** I will be done talking, but this case, the decision you make today, holds immense weight, *not just for this case*, but the principles of justice and the safety of our society, everyone here. The fact that—imagine a world where an individual can do just what we've been talking about, take his firearm outside the safety of his home, go to the fight, no threats, take himself out there to shoot this individual five times all while claiming these alleged threats; not through the phone; unjustified. There's no evidence of these. Is that *** the type of society that we want to live in where no evidence, baseless claims of threats, justifies cold-blooded killing of an individual in his car? I submit to you, no, that this is not justified. That what he did is not self-defense. That's what the evidence shows. It's not and you shouldn't find as such.

***

Today you have the power to deliver justice for the victim, for Steven Dominguez, and to uphold the principles that protect us all. Your verdict must reflect the truth of *** what actually happened. Not a tale, not fable. Let your decisions speak for the value of human life and the integrity of our legal system.

Justice for Steven Dominguez demands a verdict of first-degree murder, ladies and gentlemen." (Emphasis added.)

Defendant argues that these statements "invited the jurors to consider factors that went to matters not in the evidence, such as the greater problems of crime in society."

¶ 54    In *People v. Harris*, 129 Ill. 2d 123, 159 (1989), our supreme court held that closing remarks urging jurors to convict in order to "prevent both crime in general, and further crime by this defendant" were proper. The court later clarified its holding, stating, "*[L]imited* prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent *solely* upon its careful consideration of the specific facts and issues before it." (Emphases in original.) *People v. Johnson*, 208 Ill. 2d 53, 79 (2003). However, the court went on to say that it was error for a prosecutor to urge a jury to "send a message" through its verdict regarding a "general denunciation of society's ills." *Id.* The court stated, "The broader problems of crime in society should not be the focus of a jury considering the guilt or innocence of an individual defendant, lest the remediation of society's problems distract jurors from the awesome responsibility with which they are charged." *Id.* at 77-78.

¶ 55    We find the prosecutor's comments here were proper. Although the prosecutor commented on the impact of the jury's decision beyond the instant case and how its verdict may reflect on the general principles of justice and safety in our society, the prosecutor did not encourage the jury to base its decision solely on these matters, nor did he encourage the jury to send a message denouncing murder in general, regardless of the particular facts before it. On the contrary, the prosecutor immediately followed this statement with a summary of the facts of the instant case, discussing defendant's decision to take the firearm outside of his home, approach Dominguez's vehicle, and shoot him five times. The prosecutor stated that there was no evidence

in this case to support defendant's contention of self-defense and that justice therefore required the jury to find defendant guilty of first degree murder. We conclude that, to the extent the prosecutor spoke generally about justice and the effect of crime on our society, his comments were sufficiently tied to the facts of the instant case so as not to render them improper and were more accurately construed as statements urging the jury to administer justice without fear. See *Nicholas*, 218 Ill. 2d at 121-22. We therefore find no error.

¶ 56        Because we have determined that the prosecutor's comments were not in error, we need not determine whether the evidence was closely balanced. We conclude that defendant has therefore forfeited review of this issue and cannot avail himself of the plain error exception.

¶ 57                                    B. Autopsy Photos

¶ 58        Defendant next argues that the trial court erred in allowing photos from Dominguez's autopsy to be admitted into evidence and published to the jury where he was willing to stipulate to Dominguez's cause of death. He asserts that Dr. Patterson's medical testimony was not so complicated as to require a visual aid and the photos would not assist the jury in determining if he acted in self-defense, which he states was the only question the jury had before it. He maintains that the graphic nature of the photos was unduly prejudicial and their probative value was virtually nonexistent.

¶ 59        The decision to allow a jury to see photos of the decedent rests within the sound discretion of the trial judge. *People v. Chapman*, 194 Ill. 2d 186, 219 (2000). Photographs that are relevant to prove facts at issue are admissible and may be shown to the jury unless their prejudicial nature outweighs their probative value. *Id.* A photograph with probative value may be admitted even if the photo is also gruesome and inflammatory. *People v. Lefler*, 38 Ill. 2d 216, 221 (1967).

           "Among the valid reasons for admitting photographs of a decedent are to prove the

nature and extent of the injuries, the position, condition, and location of the body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." *Chapman*, 194 Ill. 2d at 220.

"If photographs could aid the jury in understanding testimony, they may be admitted even if cumulative of that testimony." *Id.* We review a trial court's decision to admit photographs of a decedent for an abuse of discretion. See *id.*

¶ 60        We find that the trial court here did not abuse its discretion in allowing pictures of Dominguez to be admitted into evidence and published to the jury. Although defendant argues that he was willing to stipulate to Dominguez's cause of death, the State was not required to accept such a stipulation and, in fact, did not accept that stipulation at trial. On the contrary, the State was entitled to prove every element of the crime charged and every relevant fact, including the cause of death. *Id.* at 219-20. And although defendant confessed to the killing in the 911 call and in his interview with the police, one valid for reason for admitting photographs is to corroborate a defendant's confession. *Id.* at 220. To the extent that defendant argues his confession and willingness to stipulate to the cause of death rendered the photographs irrelevant or entirely lacking probative value, we disagree.

¶ 61        Further, Dr. Patterson used the photographs in his testimony to explain Dominguez's cause of death and to help establish the circumstances of that death. Dr. Patterson used the photos to show the presence of gun powder residue around Dominguez's wounds and stated his opinion that this indicated Dominguez was shot at close proximity. He further used the photos to show the location of the two gunshot wounds on Dominguez's left eyebrow and opined that the proximity of these wounds indicated either that Dominguez was not moving when he was

shot or that the shots were delivered in rapid succession. Although defendant argues that Dr. Patterson's testimony was not so complex as to require the use of the photos in explanation, this is contradicted by both Dr. Patterson's testimony that the photos would assist him and his frequent references to the photos in explaining Dominguez's injuries. We therefore find the photos had probative value regarding the manner of death of Dominguez that outweighed the prejudicial effect of showing such graphic images. See *People v. Hicks*, 101 Ill. App. 3d 238, 242 (1981) (finding the trial court did not abuse its discretion in admitting photos of the decedent because the photos corroborated and aided the testimony of the pathologist).

¶ 62        Defendant argues that even if some photos had probative value, others did not. He takes issue with exhibit No. 8B, a photo described by Dr. Patterson as an "as-is photo," taken as soon as he opened Dominguez's body bag, prior to beginning the autopsy. The photo depicted Dominguez wearing the clothing he was shot in, with blood still on his face. Defendant argues that this photo provided no significant evidence. We disagree. When explaining the bullet wound on Dominguez's temple later in his testimony, Dr. Patterson explained the lack of gun powder residue around the wound by pointing to the hat Dominguez was wearing at the time he was shot, which was depicted in exhibit No. 8B. We further note that the shirt Dominguez is shown wearing in exhibit No. 8B is the same shirt he is wearing in the Facebook video that shows him drinking and driving in the early morning hours on the day of the shooting, corroborating Agent Rodriguez's testimony as to the date the video was taken.

¶ 63        Defendant also argues that the photos showing Dominguez's scalp partially pulled back from his skull "served only to inflame the passions of the jury against Defendant." However, somewhat confusingly, he also acknowledges that Dr. Patterson used these photos to testify as to the hemorrhaging on Dominguez's scalp and the proximity of the gun to his face when he was shot

in the temple. Contrary to defendant's argument, we find these photos clearly served a purpose in aiding Dr. Patterson's testimony. See *Chapman*, 194 Ill. 2d at 220 (stating that a valid reason for admitting photographs of a decedent is to prove the manner and cause of death and the nature and extent of the injuries).

¶ 64    We conclude the trial court did not abuse its discretion in admitting the autopsy photos.

¶ 65                                    III. CONCLUSION

¶ 66    For the reasons stated, we affirm the trial court's judgment.

¶ 67    Affirmed.